# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### June 17, 2014 Session

## STEVE CARL KING v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Giles County**
**No. 15557     Robert L. Jones, Judge**

---

**No. M2013-01722-CCA-R3-PC - Filed November 18, 2014**

---

The Petitioner, Steve Carl King, appeals the Giles County Circuit Court's denial of his petition for post-conviction relief from his conviction of attempted first degree premeditated murder and resulting twenty-two-year sentence. On appeal, the Petitioner raises numerous claims regarding his receiving the ineffective assistance of counsel. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which ROGER A. PAGE, J., and J. ROBERT CARTER, JR., Sp.J., joined.

David L. Raybin, Nashville, Tennessee, for the appellant, Steve Carl King.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Senior Counsel; T. Michel Bottoms, District Attorney General; and Lawrence R, Nickell, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

We glean the following relevant facts from this court's direct appeal opinion of the Petitioner's conviction: At trial, the victim testified that on November 4, 2005, she was "on a run" from Jacksonville, Florida, to Chicago with the Petitioner, her boyfriend of eleven years and a commercial truck driver. State v. Steve Carl King, No. M2008-01251-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 296, at *3 (Nashville, Apr. 9, 2010), perm to appeal denied, (Tenn. 2010). That evening, they stopped in northern

Alabama, parked the Petitioner's tractor-trailer truck, and shared three pitchers of beer at a Hooters restaurant. Id. The Petitioner began calling the victim names, and the name-calling escalated into an argument. Id. at *4. They returned to the truck and resumed their trip, heading toward Tennessee. Id.

While the Petitioner was driving, he and the victim continued to argue. Id. At some point, the Petitioner "reached behind the victim and retrieved a black-handled knife from a cabinet behind the victim's seat." Id. The Petitioner began swinging the knife at the victim. Id. When the victim raised her left hand to protect herself, the knife sliced her ring and middle fingers. Id. at *5. The victim was bleeding profusely, but the Petitioner initially refused to get medical help for her, so she wrapped a cloth around her hand and hung her hand outside the passenger window to avoid bleeding in the truck. Id. Eventually, the Petitioner agreed to stop and pulled up to the Ardmore Welcome Center in Giles County, Tennessee. Id. The victim said that as she was getting her medication out of the cab's sleeping compartment, the Petitioner hit her on the back of the head, causing her to lose consciousness briefly. Id. at *6. The victim then struck at the Petitioner while he pulled her hair and screamed at her. Id. Eventually, the Petitioner sat back down in the driver's seat. The victim retrieved some plastic bags containing her medication, opened the passenger door, and stepped down to the sidewalk. Id. As she got out of the truck, she noticed the Petitioner's knife on the dashboard. Id. Blood was running down her legs, but she did not know from where she was bleeding. Id. at * 7. The victim saw a man behind the trailer and walked toward him for help. Id. The Petitioner moved the truck forward, and the trailer hit the victim's shoulder, knocking her to the ground. Id. The truck's rear tires began to roll over the victim, and the Petitioner continued to move the truck forward even as the man yelled for him to stop. Id. at *7-8. The victim identified for the jury the shorts she had been wearing that night, and several slashes were in the back and crotch of the shorts. Id. at *7.

On cross-examination, the victim denied that she waved her hand around the inside of the truck to spread the blood or that she put her bloody hand in a cooler between the driver's and passenger's seats. Id. at *10. After the victim got out of the truck, she heard someone tell the Petitioner that he could not park by the sidewalk. Id. at *13. The trailer then moved forward and knocked her to the ground. Id.

Michael Solomon testified that he witnessed the Petitioner's truck run over the victim. Id. at *15. He explained,

> "[S]he just held the bags in her arms, and turned and walked
> down the side of the trailer. And about halfway down the
> trailer, she stopped, turned, facing the trailer. And the driver, in
> the meantime, put the truck in gear and started to pull over on

the shoulder, off the ramp. And the trailer knocked her over,
and the wheels ran over her mid-section."

Id. Solomon ran in front of the truck, flagged down the Petitioner, and informed him that he had just run over a woman. Id. at *15-16. The Petitioner replied, "'[N]o, I didn't.'" Id. at *16. Solomon told the Petitioner to get out of the truck and see the victim. Id. Solomon said that the victim was lying near the curb, that trucks commonly passed through that portion of the road, and that their trailer tires went over the curb. Id.

A paramedic testified that when she arrived at the scene, the victim was lying "on her back eviscerated on the grass beside the curb." Id. at *18. The Petitioner was kneeling by the victim, holding her hand, and telling her that everything would be all right. Id. The victim was flown to a trauma center in Huntsville, Alabama. Id.

A trauma surgeon testified that he performed emergency surgery on the victim and that she had multiple lacerations in her genital, pelvic, and buttock areas. Id. at *20. The cuts on the victim's shorts corresponded to the cuts on her body. Id. The victim's intestines were protruding from the area between her legs, and she had two lacerations on the fingers of her left hand. Id. at *20. The surgeon did not find any injuries to the victim's head. Id. at *21. A doctor of urology, who was present during the victim's surgery, testified that the victim had two tears in her bladder that could have been made only by a sharp object such as a knife. Id. at *19.

Trooper Allen Brennis of the Tennessee Highway Patrol testified that he responded to the scene, looked in the cab of the truck, and found it "covered with blood." Id. at 22. The Petitioner claimed that he had cut his finger that morning, but the trooper did not think such a cut could have been the source of all the blood. Id. at *24. The Petitioner also claimed that he had run over the victim accidentally. Id. at *23. Trooper Jason Kelly testified that he looked in the truck and found a cooler "half-full of bloody water." Id. at *26. He thought the Petitioner was intoxicated and arrested him for suspicion of driving under the influence (DUI). See id.

Tennessee Bureau of Investigation (TBI) Investigator Brad Elliot testified that he went to the scene, spoke with the Petitioner, and gave the Petitioner Miranda warnings. Id. at *30. The Petitioner invoked his right to counsel, so Investigator Elliot stopped speaking with him. Id. Investigator Elliot entered the truck cab and saw a "'large folding knife'" on the dashboard. Id. A reddish brown blood stain was on the knife. Id. Based on the blood-stained knife and the blood spatters in the cab, Investigator Elliot concluded that a struggle probably had occurred inside the cab. Id. The next day, the Petitioner was charged with attempted first degree murder and transported to the Giles County Jail. Id. at *31. After

being informed of the charge, he told Investigator Elliot that he "needed to 'tell [him] something.'" Id. at *32. Investigator Elliot reminded the Petitioner that he had requested an attorney, but the Petitioner insisted on speaking with the investigator privately. Id. The Petitioner told Investigator Elliot that the victim had been playing with the knife in the truck and had cut two fingers on her left hand. Id. They arrived at the welcome center and slept in the truck about two hours. Id. Before they left, the victim got out of the truck with the couple's dog so that the dog could use the restroom. Id. at *33. The Petitioner moved the truck forward in order to pull over and park, and a man banged on the Petitioner's door and told him that he had run over someone. Id. The Petitioner got out of the truck and went to check on the victim. Id. Investigator Elliot stated that all of the Petitioner's clothes were bloody, including his socks, and that he did not think the Petitioner's attending to the injured victim explained the condition of the socks. Id. at *33-34.

Chicago, Illinois Police Officer Michael Tomaso testified that in April 2006, he and Officer Christina Pena responded to a "'battery in progress'" at a bar. See id. at *40. When they arrived, Thomas Edwards, the victim's brother, told them that he had just fought the Petitioner. See id. Officer Tomaso said that he and Officer Pena handcuffed the Petitioner because the Petitioner was "highly intoxicated and belligerent." Id. After being handcuffed, the Petitioner stated, "'This is f--ing bullshit because he's mad because what I did to his sister.'" Id. When the officers began to put the Petitioner into the back of their patrol car, the Petitioner "continued to grumble about why Edwards was upset, and then the [Petitioner] said, 'I wish I had done it right the first time.'" Id.

At the conclusion of the proof in the instant case, the jury convicted the Petitioner as charged of attempted first degree premeditated murder. Id. at *42. The trial court sentenced him to twenty-two years in confinement. Id. Subsequently, the Petitioner filed a petition for a writ of error coram nobis, claiming that after the trial, the victim gave several oral and written statements recanting her trial testimony. Id. At the coram nobis hearing, the victim testified that her family had encouraged her to lie about the Petitioner and that she had testified falsely about him knocking her unconscious and stabbing her lower body. Id. She said that she had lied in order to punish him, that she still loved him, and that she "'need[ed] him so much more, now.'" Id. at *43. The trial court rejected the victim's recanted testimony. Id. The trial court noted that "the victim never actually testified at trial that the [Petitioner] had stabbed her anywhere other than her hand. Instead, the victim testified only that she remembered being knocked unconscious, struggling with [him], and noticing blood running down her legs as she got out of the truck." Id. The trial court also noted that "because the [Petitioner] testified neither at his trial nor the coram nobis hearing, he failed to provide an alternative version of how the victim sustained her injuries." Id. at *44.

The Petitioner appealed his conviction to this court, arguing that the evidence was

insufficient to support the conviction; that the trial court erred by admitting into evidence the statements he gave to the Chicago police officers; that the trial court erred by allowing the two officers to testify when the State failed to disclose their existence in accordance with Tennessee Rule of Criminal Procedure 16; and that the trial court erred by denying his petition for a writ of error coram nobis. Id. This court affirmed the judgments of the trial court. Id. at *2.

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely petition for post-conviction relief, raising various issues regarding his receiving the ineffective assistance of counsel before and after trial. The post-conviction court appointed counsel, and counsel filed amended petitions. Relevant to this appeal, the petitions alleged that the Petitioner received the ineffective assistance of counsel because (1) trial counsel failed to determine whether the victim possessed marijuana and was coerced to testify favorably for the State in return for the State's not prosecuting her for misdemeanor marijuana possession; (2) trial counsel failed to investigate adequately whether the Petitioner could have accessed the knife in the truck as the victim had alleged; (3) trial counsel failed to advise the Petitioner properly regarding the State's plea offer, including properly advising him as to the strength of the State's case and providing him with discovery so that he could make a reasoned decision regarding whether to accept the offer; (4) trial counsel failed to move to suppress the Petitioner's statements to the Chicago police officers based upon his intoxication; (5) trial counsel failed to object to testimony that the Petitioner invoked his right to counsel; (6) trial counsel inappropriately recommended that the Petitioner not testify; (7) trial counsel failed to request unanimity and enhanced unanimity instructions; and (8) post-trial counsel failed to have the Petitioner testify at the coram nobis hearing.

At the evidentiary hearing, Patrick Butler testified for the Petitioner that he was a former assistant district attorney general and one of the prosecutors in this case. He identified two packets of discovery he gave to lead trial counsel. He described the first packet as an "inch or inch-and-a-half of material" containing photographs, copies of photographs, and reports. The second packet contained a witness list and other material. According to the first packet, a "green and black pipe" was collected from the victim, and a photograph of the interior of the Petitioner's truck showed a woman's purse. During the Petitioner's coram nobis hearing, someone asked Butler if marijuana had been in the victim's purse. Butler said that that was the first time he had ever heard about marijuana in the purse, that nothing in the State's file had caused him to think marijuana was in the purse, and that he had no knowledge of the victim's having to testify in accordance with the State's case in order to avoid being prosecuted for possession of marijuana. Butler acknowledged that before trial, the victim had communicated with the Petitioner.

Butler testified that "[t]his was a very significant case" in Giles County and that the

State "did make an offer" to the Petitioner. However, he did not know whether he and lead counsel "ever got down to talking about a specific number of years." The victim received "horrendous" injuries; therefore, the State would not have considered a plea to anything less than attempted first degree murder. Butler acknowledged that according to a pretrial letter from lead counsel to the Petitioner, the State would have "consider[ed]" a fifteen-year sentence for that offense.

On cross-examination, Butler testified that although he never discussed a fifteen-year sentence with lead counsel, "I'm sure we would have done the fifteen, and I'm saying that in hindsight looking back." He said that if anyone threatened to prosecute the victim for possession of marijuana, "I can assure you . . . that did not come from me or anyone in the D.A.'s Office, and I don't think anyone associated with this case." He stated that "[a]ny time [lead counsel] showed up on a case, you knew you were going to have to work diligently on it" and that lead counsel was "always extremely prepared."

Lead trial counsel testified for the Petitioner that he had been an attorney since 1987, had always worked in private practice, and was retained by the Petitioner on August 8, 2006. Lead counsel was the Petitioner's second attorney, and a preliminary hearing already had occurred. Lead counsel met with the Petitioner to discuss the facts of the case. He said that the Petitioner was on bond and "on the road quite a bit" while awaiting trial but that he and the Petitioner talked on the telephone. In September 2006, the State attempted to revoke the Petitioner's bond for his "multiple communications" with the victim. The Petitioner and the victim both lived in Chicago, and many of those communications had been initiated by the victim. Therefore, the trial court denied the State's request. Lead counsel said he sent discovery to the Petitioner but did not send it "certified or registered or FedEx." As a result, he did not know if the Petitioner received it. However, he thought he and co-counsel went over the discovery materials with the Petitioner "more than once certainly." In addition to lead counsel's initial meeting with the Petitioner, he also met with the Petitioner prior to the bond revocation hearing. He did not recall any other specific meetings but said he and the Petitioner talked "a number of times" on the telephone. Post-conviction counsel asked lead counsel when he would have gone over the discovery materials with the Petitioner, and lead counsel said that he did not know but that he usually sent discovery materials to a client, interviewed witnesses, and then "report[ed] back" to the client.

Lead counsel testified that at some point, he learned the Petitioner had been arrested in Chicago and had made incriminating statements to the arresting officers. The State wanted to introduce the Petitioner's statements into evidence at trial, so lead counsel filed a motion to suppress based on the officers' failure to give Miranda warnings. Lead counsel did not argue that the statements were inadmissible due to the Petitioner's intoxication. Lead counsel acknowledged that he knew before trial that Officer Tomaso had thought the

-6-

Petitioner was "'highly intoxicated'" at the time of the arrest. However, lead counsel was more concerned about the Miranda issue and could not say why he did not raise the voluntariness issue. The trial court denied the motion to suppress.

Lead counsel testified that he and the Petitioner visited the scene. Although lead counsel did not remember how many times he met with the Petitioner before trial, he said he would have met with the Petitioner in August and September 2006. He also would have communicated with the Petitioner by telephone. The Petitioner's trial began on November 6, 2006, less than ninety days after lead counsel was retained. Lead counsel acknowledged that in a letter he wrote to the Petitioner on November 2, 2006, he stated that he had provided the Petitioner with all discovery materials. He also informed the Petitioner that the State "would consider a fifteen year plea offer to the offense of attempted first degree murder." He said that he did not consider the State's offer to be a binding plea offer because it had been made by Assistant District Attorney General Butler and had not been approved by the district attorney general. Nevertheless, lead counsel conveyed the offer to the Petitioner, and the Petitioner turned it down. Lead counsel said he did not request a plea to a lesser-included offense because Butler had "pretty well indicated to me that if we got anything less than first, attempted first, the jury was going to have to say [so]."

Lead counsel testified that in the November 2 letter, he also advised the Petitioner that the Petitioner had a right to testify. However, lead counsel advised the Petitioner not to testify. Lead counsel explained that the Petitioner initially had told him that someone else ran over the victim. Lead counsel thought the Petitioner's claim was going to be "virtually impossible to sell to a jury" because an eyewitness had seen the Petitioner run over the victim. Later, the Petitioner acknowledged that he ran over the victim but claimed it was an accident. Lead counsel said that although the Petitioner "absolutely" could have testified at trial, he recommended that the Petitioner not testify due to the fact that the State could have cross-examined the Petitioner on a number of issues, including intent. Lead counsel said that at some point during the trial, he told the Petitioner, "I think that . . . we've got the jury at a point where you may be convicted of a lesser included." Lead counsel was concerned that if the Petitioner testified and did not perform well, the jury would convict him of the charged offense.

Lead counsel acknowledged that the indictment had alleged that the Petitioner killed the victim with premeditation and by use of a deadly weapon "to wit: a knife and a loaded trailer." Lead counsel also acknowledged that the State was not required to specify the deadly weapon and that he did not try to have the extra language removed from the indictment. He said that the State's theory of the case was that "this was a continuing offense. In other words, the stabbing and then the running over." Lead counsel thought that if the State was going to argue that the Petitioner used the knife and the trailer to try to kill

the victim, then "the possibility of a jury thinking negligence or accident, as it relates to the trailer, [was] pretty good." He said that he and the Petitioner discussed the State's theory of the case and the fact that the State had alleged in the indictment that the Petitioner had attempted to kill the victim with the knife and the trailer. Lead counsel said he did not think he told the Petitioner that the State was going to have to prove both weapons. Lead counsel said that the trial court gave the jury the "normal unanimous jury verdict [instruction] under the T.P.I." and that he did not ask for the "enhanced" unanimity instruction with regard to the knife and the trailer because the State "would have to carry the burden beyond a reasonable doubt to prove that those two things were used for a conviction to result."

Lead counsel acknowledged that, according to our Code, criminal attempt could be committed in one of three ways and that the trial court instructed the jury on all three. Lead counsel acknowledged that he did not request a unanimity instruction regarding criminal attempt and that the jurors could have found the Petitioner guilty of attempted first degree murder based upon the different definitions in the statute.

Lead counsel testified that he and the Petitioner looked in the cab of the truck before trial and that he prepared to cross-examine the victim about the knife. At trial, lead counsel questioned the victim regarding the location of the knife and the Petitioner's access to it. Lead counsel said that during Investigator Elliot's testimony, Investigator Elliot stated that the Petitioner initially invoked his right to counsel and that he honored the Petitioner's request. Lead counsel had learned about the invocation before trial but had not anticipated the State's eliciting it from the witness. He said he did not object because "then you're faced with the, do I object and ask for a curative type instruction at this point or do I just let it go and hope the jury attaches no significance to it."

Lead counsel acknowledged that prior to his being retained, the Petitioner had back and neck surgery. However, he could not remember if he knew the Petitioner was taking medication. Lead counsel said he never had any problems communicating with the Petitioner or thought the Petitioner was under the influence or incapable of understanding. Lead counsel said he was unaware before trial that the victim had marijuana in her purse and that he learned about the issue from the Petitioner after the trial. Lead counsel acknowledged that in a letter written by the Petitioner to trial counsel on April 23, 2007, the Petitioner requested the discovery materials that the State had provided to the defense.

On cross-examination, lead counsel testified that although the Petitioner traveled often while on bond, they were able to communicate. The State had "open file" discovery, and lead counsel gave copies of discovery materials to the Petitioner. Lead counsel said that in every case, he went over everything he received with his client. Lead counsel inspected the cab of the truck twice, and the Petitioner was present during one of those inspections. Lead

counsel thought Investigator Elliot was present for both inspections. One of the reasons lead counsel looked inside the cab was to determine whether the Petitioner could have reached the knife.

Lead counsel testified that he and co-counsel interviewed both of the Chicago police officers before the suppression hearing. Lead counsel had thought the Petitioner was intoxicated at the time of the Chicago arrest. However, when lead counsel spoke with the Petitioner about the incident, the Petitioner was able to tell him what happened and why it happened. The Petitioner did not tell lead counsel that he was too intoxicated to know what he was doing, and nothing in the Petitioner's statements to the officers indicated he was too intoxicated to understand.

Lead counsel testified that he conducted "mock" direct and cross-examinations of the Petitioner before trial. After the mock examinations, lead counsel sent the Petitioner a letter in which he recommended that the Petitioner not testify. In the November 2, 2006 letter, lead counsel stated as follows:

> You have the absolute right not to take the stand and testify in your defense. I have placed you through the mock direct and cross-examinations to try and get a good feel on what type of witness you'll make. I will candidly advise you that I did not think you would make a very good witness. The testimony you would offer is not entirely plausible. It is your belief that [the victim] was somehow hit by another car. However, you cannot identify the car and when she was hit by the car, and this would directly contradict the testimony of Mr. Solomon. You also have absolutely no explanation for how [the victim] received the penetrating laceration type wounds. Simply put, I do not believe you handle cross-examination well, although we have gone through this a number of times. I want to again advise you that the decision to testify or not to testify is entirely yours. You have the right to testify even if the same is against my advice.

Lead counsel testified that in that same letter, he advised the Petitioner that the State would "consider" a fifteen-year sentence in return for a plea of attempted first degree murder. Lead counsel said that by "consider," he meant that if the Petitioner agreed to plead to attempted first degree murder in exchange for fifteen years, Assistant District Attorney General Butler would have to discuss the proposed plea with the district attorney general. Lead counsel said the State never made a "firm" plea offer and that, in any event, the Petitioner was not interested in pleading to attempted first degree murder in return for a

fifteen-year sentence.

Lead counsel testified that in the November 2 letter to the Petitioner, he stated that "this will confirm that I have provided to you all of the discovery documents which have been made available to me." Lead counsel listed in the letter some of the specific discovery materials he had provided, such as TBI reports, witness statements, reports from the Chicago police officers, and the State's witness list.

Lead counsel testified that he did not remember the Petitioner's saying that the victim had marijuana in her purse. Instead, the Petitioner "raised an issue about they have told her they would prosecute her for marijuana." In response to the Petitioner's claim, lead counsel reviewed the victim's toxicology report, which showed that she had tested negative for marijuana. He also could not find anything in the victim's medical records regarding the drug. Lead counsel thought the victim's family was pressuring her "to push the prosecution" but never received information that the State was pressuring her. Regarding the indictment, lead counsel and the Petitioner discussed the fact that the indictment alleged two deadly weapons. Lead counsel learned that the State's theory at trial was going to be that this was a "continuing offense that started with the knife and ended with the trailer running over her." Lead counsel said he thought that some of the jurors might think the State had to prove beyond a reasonable doubt that the Petitioner used both weapons and that "that could possibly be beneficial for and to us as a defense."

The record reflects that after lead counsel filed the Petitioner's motion for new trial, he and co-counsel withdrew from the Petitioner's case, and "new counsel" was retained to represent the Petitioner. At the post-conviction evidentiary hearing, new counsel testified for the Petitioner that he became licensed to practice law in 2005 and began representing the Petitioner on November 5, 2007. At that time, the Petitioner's motion for new trial hearing was pending. New counsel met with the Petitioner five to ten times, and they corresponded by mail. New counsel said that the Petitioner was still having contact with the victim "on a semi-regular basis" and that the victim had made comments to the Petitioner "that tended to be in the nature of a recantation of her trial testimony." New counsel spoke with the victim on the telephone, and she confirmed what she had told the Petitioner. Therefore, new counsel filed a petition for a writ of error coram nobis based on her recantation. At the coram nobis hearing, new counsel called the victim to testify but did not call the Petitioner. He said that the Petitioner did not "express a desire" to testify and that "I don't see what benefit it would have been to him to testify at that hearing. The substance of the newly discovered evidence, or the recanted testimony I guess being the newly discovered evidence, really pertained solely to [the victim]." Additionally, the Petitioner's direct appeal of his conviction was still pending. New counsel said he did not remember if he told the Petitioner that the Petitioner could testify.

New counsel testified that the Petitioner raised an "issue" about marijuana. New counsel said that he had a conversation with the victim about it but that "I don't remember it having a large bearing on what went on." He said he did not recall the victim's telling him that she was pressured to testify against the Petitioner. He stated, "She may have said that to me, but I don't recall that; and I think I would have recalled it if she had said that."

On cross-examination, new counsel acknowledged that the Petitioner would have been subject to cross-examination if the Petitioner had testified at the coram nobis hearing. Upon being questioned by the post-conviction court, new counsel stated that after the jury convicted the Petitioner, the victim "felt that she needed to be completely forthcoming and that basically anger motivated her prior testimony." New counsel said that he did not know if trial counsel provided discovery materials to the Petitioner and acknowledged that in a pro se motion filed by the Petitioner in the Giles County Circuit Court on September 17, 2007, the Petitioner requested all the discovery materials in the Petitioner's file.

TBI Investigator Brad Elliot testified for the Petitioner that he was the lead investigator in this case. He retained the victim's purse as evidence for several months and then returned it to her or her family. While he had the purse, he kept it secured in his office but did not log it into the property room. Investigator Elliot never formally inventoried the purse but remembered that it contained a cellular telephone, the victim's prescription medicine bottles, a wallet, and her identification. He said he collected the victim's clothing from the Giles County EMS, and he acknowledged that a receipt for the clothing listed a "green and black pipe." He said he was never able to determine if the victim owned the "paraphernalia type pipe" or if the Petitioner "put that on her."

On cross-examination, Investigator Elliot denied that any police officers or anyone from the district attorney's office threatened or coerced the victim to testify against the Petitioner. He said he did not find marijuana on the victim's person and did not hear of other investigators finding marijuana on her. He witnessed lead counsel examine the interior of the Petitioner's truck but recalled being present during only one examination of the truck.

The Petitioner testified that he was fifty years old and had prior convictions resulting from an altercation at a hockey game and possession of marijuana. He stated that lead counsel advised him not to testify at trial and that he had wanted to testify because he "could have changed, probably, some of the jurors' minds." The Petitioner then testified about the incident as follows: In November 2005, the Petitioner had known the victim eleven or twelve years. On the night of November 4, the Petitioner and the victim got into an argument. The Petitioner, who was driving, had a knife in his hand, and the victim grabbed the blade, cutting two fingers on her left hand. He said that the victim was mad at him and that she "started slinging blood all over the truck on the inside and just everywhere saying

the cops are going to get you when they see this." After the victim calmed down, she held her hand outside the window to avoid getting blood inside the truck. She also put her hand into a cooler of ice water to slow the bleeding. The Petitioner said that he had wanted to get help for the victim but that they had been drinking alcohol and that he was afraid of being arrested for DUI. When they arrived in Tennessee, he pulled into a rest area and looked for a place to park but could not find one. Therefore, he pulled in front of the rest area and told the victim to get out and call for an ambulance. The victim got out of the truck and walked along the passenger side of the trailer. Michael Solomon, who was standing on the passenger side of the tractor, yelled at the Petitioner to pull the truck forward because the trailer was "blocking the entrance from the rest area to the expressway." The Petitioner said Solomon ran in front of the truck and waived the Petitioner forward, so the Petitioner moved the truck five to ten feet. The Petitioner said he did not want to run over the victim, so he asked Solomon, "[W]here's she at[?]" The Petitioner said Solomon "looked down the side of the truck" and told him, "I think you ran over her." The Petitioner replied, "[N]o way." He looked out the passenger door, saw the victim lying in the grass, and went to help her.

The Petitioner acknowledged that after the incident, he gave inconsistent statements to law enforcement officers. He said that he had been worried about being charged with DUI and that he would not be allowed to go to the hospital with the victim. He acknowledged that he was responsible for cutting the victim's hand and that he ran over her but said that he did not run over her with premeditation. He said that he did not stab the victim in the abdomen and that he thought her bladder injuries occurred when the truck ran over her.

The Petitioner testified that at some point, he and the victim's brother got into an altercation in Chicago and that the State tried to revoke his bond. The Petitioner had been drinking alcohol prior to his Chicago arrest and told trial counsel that he had been intoxicated. The Petitioner said that he and the victim lived in Chicago, that his house was only ten blocks from her house, and that her family members telephoned the police every time they saw him. Therefore, he began living in his truck in order to stay of out trouble and never received the discovery materials that trial counsel sent to him. After the trial, the Petitioner tried to get a copy of discovery, but he did not receive anything until post-conviction counsel provided discovery to him.

The Petitioner testified that about a week before trial, he and lead counsel inspected the evidence in this case, including the truck. At that time, the Petitioner was recovering from back and open heart surgery and was taking Vicodin for pain and Valium for muscle cramps and sleep. He said that the medications affected his ability to consult with lead counsel "[a] little bit" and that he also had been drinking alcohol when he and lead counsel met to discuss the evidence. The Petitioner acknowledged that he received a letter from lead counsel dated November 2, 2006, and that lead counsel had him sign the letter. The

-12-

Petitioner said lead counsel read the letter to him and asked what he thought about "fifteen to twenty years." The Petitioner said he told counsel that "that doesn't sound like much of a deal to me." He said that if the State had made a firm offer of fifteen years, he would have accepted it. The Petitioner acknowledged that lead counsel conducted mock direct and cross-examinations and that lead counsel said he would not be a good witness.

The Petitioner testified that marijuana was in the victim's purse on the night of the incident but that she had not smoked it. The pipe in the victim's purse also belonged to her. Before trial, the victim told the Petitioner that "they were pressuring her with the bag of marijuana saying they were going to put her in T.D.O.C. if she didn't . . . follow their instructions." The Petitioner told lead counsel about the issue. However, lead counsel told the Petitioner that "that's not in evidence so he can't bring it up" and that he did not want to anger the judge or the jury by "badgering" the victim. The Petitioner said that if lead counsel had cross-examined the victim about the marijuana, lead counsel could have shown that the State coerced her. The Petitioner also told new counsel about the issue. At the coram nobis hearing, the victim testified that the Petitioner did not stab her in the abdomen, but new counsel did not question her about the marijuana.

The Petitioner testified that prior to this incident, he kept the knife in the truck because he sometimes needed it for work. On the night of November 4, he got the knife from the side of his seat. The knife was already open because he had used it earlier to fix his turn signal. After the victim grabbed the blade and cut her fingers, the Petitioner put the knife on the dashboard. At trial, the victim testified that the Petitioner stabbed her while she was in the cab's sleeping compartment. The Petitioner said he could not have stabbed the victim while he was driving. The Petitioner thought the State had to prove that he tried to kill the victim with the knife and the trailer because the State had alleged both weapons in the indictment. Moreover, counsel told him that the State had to prove he tried to kill the victim with both weapons.

On cross-examination, the State showed the Petitioner a photograph of the cooler containing the bloody water and asked if all the blood in the cooler came from cuts to the victim's fingers. The Petitioner answered yes and said that the cuts on the victim's hand were "[p]retty deep." He stated that the blood inside the cab, outside the cab, and on the front of the trailer also came from the victim's fingers. The Petitioner identified a statement he gave to the police on the night of the incident. He said that he was intoxicated when he gave the statement and that he did not remember if he told trial counsel he was intoxicated when he gave the statement. The Petitioner said that he did not remember if he was too intoxicated to talk to the Chicago police officers about his running over the victim. When the Petitioner and lead counsel met to go over the evidence before trial, the Petitioner did not tell lead counsel that he was too intoxicated for the meeting.

-13-

The Petitioner acknowledged that he did not know who pressured the victim to testify against him. The Petitioner told the victim to testify at the coram nobis hearing about the coercion, but she did not mention it because she "didn't want to get nobody in trouble." The Petitioner acknowledged that he rejected the plea offer mentioned in the November 2, 2006 letter. However, counsel orally told him that the offer was for fifteen to twenty years, not fifteen years. The Petitioner stated that although the letter said fifteen years, he did not read the letter. The Petitioner also acknowledged that the letter advised him that trial counsel had given him all of the discovery in the case. However, the Petitioner had told lead counsel that he was living in his truck and that he could not receive mail.

Co-counsel testified for the State that he became licensed to practice law in 2002 and worked closely with lead counsel on the Petitioner's case. He said that he did not remember the State's making any plea offer to the Petitioner or marijuana being found on the victim. Co-counsel said that he was present for two of lead counsel's meetings with the Petitioner before trial. During the meetings, the Petitioner did not seem impaired by alcohol or medications and never said anything about being impaired. Co-counsel also was present for some of lead counsel's mock examinations of the Petitioner and when lead counsel talked with the Petitioner about testifying. Co-counsel acknowledged that a <u>Momon</u> hearing occurred during the trial and that the Petitioner advised the trial court that he did not want to testify.

On cross-examination, co-counsel acknowledged that he interviewed Officer Pena of the Chicago Police Department before the hearing on the motion to suppress the officer's statement and that she told him the Petitioner was highly intoxicated. He said he had been unaware of the "offer" mentioned in lead counsel's November 2, 2006 letter and that the offer was not a plea offer but "an offer to negotiate on a plea." Co-counsel said that he witnessed lead counsel's mock examinations of the Petitioner, that the Petitioner did not testify well, and that he did not think the Petitioner was going to testify well at trial.

In a written order, the post-conviction court denied the petition for post-conviction relief. On appeal, the Petitioner challenges the court's ruling. The State argues that the post-conviction court properly denied the petition. We agree with the State.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. <u>See</u> Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" <u>State v. Holder</u>, 15 S.W.3d 905, 911 (Tenn. Crim.

App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Generally, [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component. Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

First, the Petitioner claims that he received the ineffective assistance of counsel because lead counsel failed to determine whether the victim possessed marijuana on the night of November 4, 2005, and, therefore, was subject to coercion by the State. However, in its written order, the post-conviction court found that although the evidence showed the victim possessed the drug pipe, there was no evidence she possessed marijuana or was coerced by the State to testify against the Petitioner. Obviously, the court discredited the Petitioner's testimony that the victim had marijuana in her purse and that she was coerced to testify according to the State's theory of the case. Therefore, the Petitioner is not entitled to relief on this issue.

Second, the Petitioner contends that he received the ineffective assistance of counsel because trial counsel failed to investigate whether he could have reached the knife and stabbed the victim, who was in the sleeping compartment, while he was driving. However, the post-conviction court found that the Petitioner failed to prove by clear and convincing evidence "that this investigation would have resulted in anything beneficial to the Petitioner." Moreover, our review of the State's closing argument at trial reveals that the State's theory of the case was that the Petitioner stabbed the victim in the sleeping compartment after he stopped the truck at the welcome center and she went into the sleeping compartment to get her personal effects. The State did not argue that the Petitioner stabbed the victim in her abdomen while he was driving. Therefore, we find no merit to this claim.

Third, the Petitioner contends that he received the ineffective assistance of counsel because lead counsel failed to advise him properly about the terms of the State's plea offer. In a related claim, he contends that lead counsel incorrectly told him that the State would have to prove that he used the knife and trailer to try to kill the victim and that lead counsel failed to provide him with discovery, both of which prevented him from making a reasonable decision about whether to accept the State's offer. In denying relief, the post-conviction court concluded that the evidence "clearly" established that the State was willing to consider an offer from the Petitioner and that lead counsel communicated "that an opportunity existed to [plead] to the indictment and receive a sentence of 15-20 years." The post-conviction court, addressing the Petitioner's claims regarding lead counsel's not providing him with discovery and improperly advising him about the State's having to prove his use of the knife and the trailer, found that the evidence did not support "the allegation that trial counsel failed to communicate plea offers to the Petitioner or otherwise failed to adequately communicate with him about the case." The court obviously accredited lead counsel's testimony that although he did not consider the State's offer to be a firm plea offer, he nevertheless communicated it to the Petitioner and that the Petitioner was not interested in the offer. Lead counsel also testified that he did not think he told the Petitioner that the State was going to have to prove the Petitioner used both the knife and trailer and that he sent all discovery materials to the Petitioner. We note that lead counsel addressed the fifteen-year offer and the discovery materials in his November 2006 letter to the Petitioner; that the Petitioner said counsel read the letter to him; and that the Petitioner signed the letter. Therefore, the evidence does not preponderate against the findings of the post-conviction court, and the Petitioner has failed to demonstrate that he is entitled to relief.

Fourth, the Petitioner argues that he received the ineffective assistance of counsel because lead counsel failed to file a motion to suppress his statements to the Chicago police officers based on his intoxication. In addressing this issue, the post-conviction court noted that intoxication alone is not sufficient to prove involuntariness and found that the Petitioner failed to provide any other evidence "of circumstances other than his intoxication" to show

that his statements were involuntary. We agree with the post-conviction court. As this court has stated, "The test to be applied 'is whether, at the time of the statement, the accused was capable of making a narrative of past events or of stating his own participation in the crime.'" State v. Curtis Daniel Hart, No. W2006-01332-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 625, at *13 (Jackson, Aug. 9, 2007) (quoting State v. Morris, 24 S.W.3d 788, 805 (Tenn. 2000)). Granted, the evidence at trial showed that the Petitioner was "highly intoxicated" at the time of his Chicago arrest. However, lead counsel testified that the Petitioner never claimed he was too intoxicated to know what he was doing and that the Petitioner told him about the altercation with the victim's brother and why it happened. We note that the Petitioner's testimony at the evidentiary hearing did not contradict lead counsel's testimony. Therefore, the Petitioner has failed to show that counsel rendered deficient performance for failing to raise his intoxication in the motion to suppress.

In the Petitioner's fifth, sixth, and seventh issues, he alleges, respectively, that he received the ineffective assistance of counsel because lead counsel failed to object when Investigator Elliot testified that the Petitioner invoked his right to counsel, because lead counsel improperly advised him not to testify at trial, and because new counsel failed to call him as a witness at the coram nobis hearing. However, in each situation, the post-conviction court accredited counsel's testimony and determined that counsel's decision was a valid trial strategy.[1] This court has stated that "[w]hen reviewing trial counsel's actions, this court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics." Irick v. State, 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998). On appeal, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsels behavior by "20-20 hindsight." See State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982).

Lead counsel testified that he had not expected Investigator Elliot to mention at trial the Petitioner's invocation of the right to counsel and that he decided not to object so as not to draw the jury's attention to the testimony. Lead counsel also testified that based on the mock direct and cross-examinations, he thought the Petitioner was not going to be a good witness. We note that in the November 2006 letter, lead counsel detailed to the Petitioner why he thought the Petitioner should not testify but advised the Petitioner that the Petitioner could testify against lead counsel's advice. The Petitioner claims in his appellate brief that, "on occasion," he was too impaired by prescription medication to understand trial counsel's

---

[1]Regarding lead counsel's failure to have the Petitioner testify at trial, the post-conviction court also found the claim to be without merit because the trial court conducted a Momon hearing to ensure that the decision not to testify was the Petitioner's decision, the Petitioner gave the appropriate responses to the trial court's questions during the Momon hearing, and the Petitioner demonstrated that he understood his right to testify.

advice. However, the post-conviction court, obviously accrediting lead and co-counsel's testimony that they never had any trouble communicating with the Petitioner, found this issue to be without merit, and nothing preponderates against the court's finding. Regarding the Petitioner's not testifying at the coram nobis hearing, new counsel testified that the Petitioner never expressed a desire to testify and that, in any event, the Petitioner would have been subject to cross-examination by the State while his direct appeal was still pending. The evidence at the evidentiary hearing supports the post-conviction court's conclusion that the decisions of counsel were based on trial strategy. Therefore, the Petitioner has failed to show that counsel rendered deficient performance.

As his final ineffective assistance of counsel claim, the Petitioner contends that trial counsel should have requested a unanimity instruction with regard to the three "'varieties'" of criminal attempt and that lead counsel should have requested an enhanced unanimity instruction with regard to the knife and the trailer. Regarding the latter argument, he contends that an enhanced unanimity instruction was necessary because the alleged stabbing occurred "well before" the victim exited the truck and he ran over her; thus, "the evidence established two discreet acts separated by time and space."

"A defendant's right to a unanimous verdict before imposition of conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of assembling a 'patchwork verdict' based on the different offenses in evidence." Tidwell v. State, 922 S.W.2d 497, 501 (Tenn. 1996). Our supreme court has repeatedly held that, if the prosecution offers proof of multiple offenses in support of a single charged offense, it must elect the facts upon which it is relying to establish the charged offense. State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001); State v. Kendrick, 38 S.W.3d 566, 568 (Tenn. 2001); State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999). Requiring an election "safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." Johnson, 53 S.W.3d at 631 (citing Brown, 992 S.W.2d at 391).

Regarding counsel's failure to request a unanimity instruction for the three "varieties" of criminal attempt, the post-conviction court concluded that an instruction was not required because "[t]he jury need not unanimously agree on any particular alternative within a statute." We agree with the post-conviction court. Although the trial court instructed the jury on all three subdivisions of "criminal attempt" in Tennessee Code Annotated § 39-12-101(a), "[s]ubdivisions (a)(1)-(3) are not intended to define mutually exclusive kinds of criminal attempt. Rather, these three subdivisions set out alternative statutory tests for determining if a course of conduct that does not produce a proscribed harm can be classified as an attempt to commit an offense." Tenn. Code Ann. § 39-12-101, Sentencing Comm'n Cmts. Thus, a trial court does not err when it instructs a jury on all three versions of criminal

attempt. State v. Daniel Joe Brown, No. 02C01-9611-CC-00385, 1997 Tenn. Crim. App. LEXIS 1222, at *25-26 (Jackson, Dec. 3, 1997) (stating that "there is no requirement that the jury unanimously agree on one of the three theories necessary to support an attempted crime); see State v. Marcus Smith, No. W2012-01992-CCA-R3-CD, 2014 Tenn. Crim. App. LEXIS 165, at *21-22 n.7 (Jackson, Feb. 25, 2014).

As to lead counsel's failure to request an enhanced unanimity instruction for the two weapons alleged in the indictment, the post-conviction court found that an instruction was not required because the "Petitioner's acts in this case were simply composite pieces of a single attempted murder." We agree with the post-conviction court.

Initially, we note that "such an instruction is not required even in cases where the proof does indicate more than one offense. The election requirement itself alleviates any unanimity concerns." State v. Johnson, 53 S.W.3d 628, 635 (Tenn. 2001). Interestingly, the Petitioner does not claim that an election of offenses was required in this case. In any event, the single-count indictment alleged one offense: attempted first degree premeditated murder committed with two weapons, the knife and the trailer.[2] During closing arguments, the State argued that after the Petitioner stopped the truck at the welcome center, he stabbed the victim in the sleeping compartment, the victim got out of the truck, and the Petitioner ran over her. In State v. Pelayo, 881 S.W.2d 7, 13 (Tenn. Crim. App. 1994), this court reasoned that the victim's attempt to escape did not divide the defendant's assaults into multiple crimes when the defendant stabbed the victim, the victim fled, and the defendant stabbed her again. Although the assaults in Pelayo were separated by "a few seconds and feet," we believe the facts in this case also constituted a single act. Pelayo, 881 S.W.2d at 13. The record reflects that the trial court gave the standard instruction that the jurors were to render a unanimous verdict. Given that the evidence indicated only one offense, an enhanced unanimity instruction was not required. Therefore, we conclude that the Petitioner is not entitled to post-conviction relief.

The Petitioner also alleges in his appellate brief that the evidence is insufficient to support the conviction; that his statements to the Chicago police officers were introduced into evidence at trial in violation of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights; that he was denied due process when the trial court allowed the Chicago officers to testify even though the State had failed to disclose their existence before trial; and that he was denied due process because the victim recanted her testimony at the coram nobis hearing. However, all of these issues were addressed in this court's direct appeal of the Petitioner's

---

[2]Use of a deadly weapon is not an element of premeditated murder. See Tenn. Code Ann. § 39-13-202(a)(1) (defining first degree premeditated murder as the intentional and premeditated killing of another).

conviction, and issues that have been previously determined cannot be relitigated.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA McGEE OGLE, JUDGE